NOTICE

*Memorandum decisions of this court do not create legal precedent.  A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| DARWIN B., | ) | |
| | ) | Supreme Court No. S-16211 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-13-00336 CN |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| STATE OF ALASKA, DEPARTMENT | ) | AND JUDGMENT[*] |
| OF HEALTH & SOCIAL SERVICES, | ) | |
| OFFICE OF CHILDREN'S SERVICES, | ) | No. 1608 – January 4, 2017 |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Erin B. Marston, Judge.

Appearances:  Lars Johnson, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant. Kathryn R. Vogel, Assistant Attorney General, Anchorage, and James E. Cantor, Acting Attorney General, Juneau, for Appellee.

Before:  Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

## I.      INTRODUCTION

A father appeals the superior court's decision terminating his parental rights to his son.  The father challenges the court's finding that the Office of Children's

---

[*]      Entered under Alaska Appellate Rule 214.

Services (OCS) made reasonable efforts to reunify the family. Because the record supports this finding, we affirm the superior court's termination of his parental rights.

## II.  FACTS AND PROCEEDINGS

Darwin B.[1] is the father of two children; the older child, Albert, is the subject of this appeal. Darwin's wife, Ruth, voluntarily relinquished her parental rights to Albert in October 2015.

OCS first became involved with Darwin, Ruth, and Albert in May 2010, when Albert was ten weeks old. Over the next three years, OCS received 13 additional reports of harm to Albert, most of which were unsubstantiated.

OCS received the first substantiated report of harm in January 2013 following the parents' separation. OCS learned that Darwin had forcibly taken Albert from Ruth's custody by grabbing him from his car seat in a Wal-Mart parking lot. Police responded to the incident, but Darwin refused to return Albert to Ruth. Darwin instead drove home with Albert — despite not having a valid driver's license — and refused to pull over for police. He pulled into his driveway, stated that he was armed, and refused to leave the vehicle until the police had retreated. The police left and arrested him two days later. Darwin was later convicted of failure to stop at the direction of an officer. He was sentenced to 24 months in custody with 21 months suspended, and he was placed on probation for three years.

The second substantiated report of harm came in May 2013. Alaska State Troopers responded to a report that Ruth was unconscious after a drug overdose; she later tested positive for synthetic marijuana (Spice), and OCS initiated an emergency custody petition for Albert. Albert was placed with a relative, Kit.

---

[1]  Pseudonyms have been used to protect the family members' privacy.

Before OCS initiated custody proceedings in May 2013, it had already created a safety plan for the family. The safety plan set up a schedule of urinalyses (UAs) and hair follicle screening for Darwin and Ruth, which Darwin did not attend. Once Albert was taken into state custody, OCS also referred Darwin and Ruth for mental and behavioral health assessments, assisted with visitation, and provided transportation vouchers. Darwin did not follow through on these referrals, and he failed to show up for scheduled meetings with his caseworkers.

Soon after OCS placed Albert with Kit, Darwin and Ruth moved from Palmer to Anchorage without informing their caseworker. It took several months for OCS to obtain a new address for Darwin, and the case was not assigned to a new caseworker in Anchorage until October 8, 2013. Because of its failure to communicate with the parents during this time period, OCS stipulated to a lack of reasonable efforts at reunification between June 26 and October 9, 2013.

Over the next two years, OCS caseworkers continued to communicate with and provide referrals for Darwin and Ruth. Darwin failed to engage with or complete the majority of services to which he was referred, including random UAs and a healthy relationships class. In October 2013 OCS asked Darwin to undergo a psychological evaluation at OCS's expense. He did not complete the evaluation until the superior court issued an order requiring him to do so in early 2015. During a September 2014 substance abuse and mental health evaluation, Darwin "denied having previous mental health diagnoses" or any symptoms of mental illness. Nevertheless, the evaluator recommended marriage and/or family psychotherapy, in which Darwin did not engage.

Darwin frequently failed to show up for meetings with OCS workers and did not respond to attempts to contact him. He was often antagonistic when he did speak with OCS workers. Albert's therapist recommended suspending visitation with Darwin

and Ruth on two occasions because they did not follow the visitation rules. At least one domestic violence incident involving Darwin and Ruth was reported during this time.

Darwin and Ruth had a second child in July 2015, and in August they moved to Washington without informing OCS, Kit, the supervised visitation center, or Darwin's probation officer. The parents returned to Alaska in October, and Darwin was briefly incarcerated for leaving Alaska in violation of the terms of his probation. Ruth relinquished her parental rights to Albert in October 2015, and the trial to terminate Darwin's parental rights began in November 2015.

At the close of trial, the superior court found that OCS had met its burden to terminate Darwin's parental rights. With regard to its "reasonable efforts" findings, the court noted that "prior to removal [OCS] attempted to assist the parents; after removal they provided cab fare, they provided bus fare, they recommended treatment programs, they recommended [a psychological evaluation with forensic psychologist] Dr. [Michael] Rose, they facilitated all kinds of therapy for the child, they did visitation between the parents [and Albert] . . . . OCS here clearly worked with [Darwin] and got not much in return." Darwin now appeals.

## III. STANDARD OF REVIEW

In child in need of aid cases, "[w]hether OCS made reasonable efforts to reunify the family is a mixed question of law and fact."[2] "We review the legal portion

---

[2] *Sherman B. v. State, Dep't of Health & Soc. Servs.*, 290 P.3d 421, 428 (Alaska 2012) (citing *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1104 (Alaska 2011)).

of this question de novo."[3] In reviewing a determination de novo, we adopt "the rule of law that is most persuasive in light of precedent, reason, and policy."[4]

Factual findings are reviewed for clear error.[5] "Findings are clearly erroneous if review of the entire record leaves us with 'a definite and firm conviction that a mistake has been made.' "[6]

## IV. DISCUSSION

"Before terminating parental rights [under AS 47.10.088], the trial court must find by clear and convincing evidence that OCS made timely, reasonable efforts to provide family support services designed to prevent out-of-home placement or enable the child's safe return to the family home" in accordance with AS 47.10.086.[7] In

---

[3] *Amy M. v. State, Dep't of Health & Soc. Servs.*, 320 P.3d 253, 257 (Alaska 2013) (citing *Sherman B.*, 290 P.3d at 428).

[4] *Jeff A.C., Jr. v. State*, 117 P.3d 697, 702 (Alaska 2005) (quoting *D. M. v. State, Div. of Family & Youth Servs.*, 995 P.2d 205, 207 (Alaska 2000)).

[5] *Sherman B.*, 290 P.3d at 427 (citing *Christina J.*, 254 P.3d at 1103).

[6] *Id*. at 427-28 (quoting *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1253 (Alaska 2010)).

[7] *Sylvia L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 343 P.3d 425, 432 (Alaska 2015) (citing AS 47.10.086(a) and AS 47.10.088(a)(3)). Under AS 47.10.086(a), the duty of the Department of Health and Social Services to engage in reasonable efforts to reunify the family includes the duty to:

(1) identify family support services that will assist the parent or guardian in remedying the conduct or conditions in the home that made the child a child in need of aid;

(2) actively offer the parent or guardian, and refer the parent or guardian to, the services identified under (1) of this subsection; the department shall refer the parent or guardian

(continued...)

determining whether OCS's reunification efforts were reasonable, we consider "the state's reunification efforts . . . in their entirety" rather than during a "particular segment of time."[8] We may also consider the parents' "unwillingness to participate in treatment."[9] The primary consideration in the "reasonable efforts" determination is the child's best interests.[10]

### A. OCS's Lack Of Reasonable Efforts Between June And October 2013

The parties stipulated that OCS's failure to communicate with Darwin and Ruth between June 26 and October 9, 2013 amounted to a lack of reasonable efforts during that time. Darwin argues that OCS's failure during this three-month period led to a breakdown in trust that OCS never repaired, rendering its subsequent efforts insufficient. Darwin asserts that, although we ordinarily consider OCS's efforts in their entirety, his case is unique because OCS's early communication failure soured the rest of the parents' relationship with OCS. While OCS acknowledges that there were communication problems with caseworkers, the record indicates that Darwin was

---

[7] (...continued)
to community-based family support services whenever community-based services are available and desired by the parent or guardian; and

    (3) document the department's actions that are taken under (1) and (2) of this subsection.

[8] *Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 77 P.3d 715, 720 (Alaska 2003).

[9] *Amy M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 320 P.3d 253, 259 (Alaska 2013) (citing *Audrey H. v. State, Office of Children's Servs.*, 188 P.3d 668, 678 (Alaska 2008)).

[10] *Jeff A.C., Jr. v. State*, 117 P.3d 697, 706 (Alaska 2005) (citing AS 47.10.086(f)).

reluctant to engage with OCS workers and consistently failed to follow through on referrals even before June 2013.

Even before OCS was involved with the family, Darwin had undergone psychological evaluations in 2006 and 2010; despite being diagnosed with at least three different mental disorders, he did not follow up with treatment referrals from those evaluations. In January 2013, after he reported to the psychiatric emergency department at Providence Hospital for a mental health crisis, he was referred to outpatient service providers; however, there is no evidence that he ever followed up with those services.

Darwin's hostility toward OCS workers also appears to predate the June to October 2013 communication failure. During a visit to Darwin's home following a report of harm in 2012, Darwin "wanted to tape record everything," did not allow the OCS worker to speak to anyone in the home privately, and called OCS after the visit to complain. Considering the evidence of Darwin's behavior before June 2013, Darwin's argument that the court failed to consider the effect of the three-month period is without merit.

Nothing in the record indicates that Darwin's behavior would have been different had OCS maintained communication between July and October 2013. In light of Darwin's history of non-cooperation, OCS's consistent reunification efforts for approximately 25 months beginning in October 2013 were more than sufficient to remedy its early failure to make reasonable efforts.[11]

**B.     OCS's Efforts To Address Darwin's Mental Health Issues**

Darwin argues that "OCS needed to acknowledge Darwin's mental health concerns early in its work with him so that it could address his concerns rather than

---

[11]     *See Frank E.*, 77 P.3d at 720 (finding that an additional 13 months of reasonable reunification efforts were sufficient to overcome the initial seven months of inadequate efforts).

alienate Darwin. OCS failed to do so and, therefore, did not make reasonable efforts to reunite Darwin with his son." We disagree.

We have not affirmatively held that a parent's mental illness necessarily imposes a heightened duty on OCS;[12] rather, we have employed a case-by-case approach to assessing the reasonableness of OCS's efforts.[13] In making that assessment, we may consider the parent's history of substance abuse[14] and willingness to participate in treatment,[15] the history of services provided by OCS,[16] and the parent's level of cooperation with OCS.[17] To fulfill its duty to make reasonable efforts at reunification, OCS must "set[] out the types of services that a parent should avail himself or herself of in a manner that allows the parent to utilize the services."[18]

Darwin's assertion that OCS failed to acknowledge his mental health concerns is contradicted by the record. OCS referred Darwin for a psychological

---

[12]    *See Audrey H.*, 188 P.3d at 680 (noting, but not assessing or ruling on, the superior court's determination that a mother's suspected brain damage created a heightened duty for OCS to "more assertively gain [the parent's] confidence and get her to participate").

[13]    *Id.* at 678 ("OCS's efforts must be evaluated in light of the circumstances of each particular case . . . ." (citing *Jeff A.C., Jr.*, 117 P.3d at 707)).

[14]    *Sylvia L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 343 P.3d 425, 432 (Alaska 2015).

[15]    *Id*. (citing *Amy M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 320 P.3d 253, 259 (Alaska 2013)).

[16]    *Id*. (citing *Audrey H.*, 188 P.3d at 679 n.35).

[17]    *Id*. (citing *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 310 P.3d 943, 953 (Alaska 2013)).

[18]    *Audrey H.*, 188 P.3d at 679 (quoting *Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 77 P.3d 715, 720 (Alaska 2003)).

assessment in every case plan it developed — including the initial case plan that was agreed upon before the family moved to Anchorage — with the goal of identifying appropriate services for him. Darwin consistently failed to follow through on these referrals. He eventually obtained an evaluation from Dr. Richard Lazur but refused to release it to OCS. He ultimately underwent an evaluation with Dr. Rose only after OCS obtained a court order — over Darwin's opposition — for a psychological evaluation in February 2015. Darwin finally completed the evaluation under court order in May 2015, nearly two years after OCS first requested it. The record thus indicates that it was not OCS's failure, but rather Darwin's refusal to acknowledge his mental health issues, that ultimately prevented the success of OCS's reunification efforts.

Given Darwin's consistent refusal to undergo a psychological evaluation, it is difficult to imagine what more OCS reasonably could have done to address his mental health concerns. "A parent's demonstrated unwillingness to participate in treatment may be considered in determining the reasonableness of state efforts,"[19] and in light of all the circumstances of this case, we conclude that the record supports the superior court's determination that OCS made reasonable efforts to reunify the family.

V.     CONCLUSION

We AFFIRM the superior court's termination of Darwin's parental rights.

---

[19]     *Id.* at 678.