NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| TYLER K., | ) | |
| | ) | Supreme Court No. S-16310 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-14-00396 CN |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| STATE OF ALASKA, DEPARTMENT | ) | AND JUDGMENT* |
| OF HEALTH & SOCIAL SERVICES, | ) | |
| OFFICE OF CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | No. 1611 – February 1, 2017 |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Patrick J. McKay, Judge.

Appearances: Andrew Ott, Johnson Kamai & Trueb, LLC, Kodiak, for Appellant. Laura Fox, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

## I.    INTRODUCTION

A father challenges a trial court's termination of his parental rights to his son. He argues that each of the court's findings on the elements of the termination order was erroneous. Because the record supports the court's findings, we affirm the termination order.

---

\*        Entered under Alaska Appellate Rule 214.

## II.    FACTS AND PROCEEDINGS

In early September 2014 the Office of Children's Services (OCS) filed a petition for emergency custody of Aaron, a five-year-old boy living in Anchorage with his father Tyler, his mother Jessie, and his half-brother.[1] OCS submitted the petition in response to a domestic violence report Jessie had made a few days earlier alleging that Tyler had beaten her while Aaron was present.

The trial court held an emergency probable cause hearing on the petition later that month. Jessie testified about the domestic violence incident, stating that Tyler had become angry with her and hit her on the eye. She said that Aaron could not see them but that he called out to Tyler, "that's my mom, Dad, that's my mom." Jessie said that when Tyler then opened the front door of their home and found a male friend of hers standing there, Tyler attacked him as well. Tyler denied hitting Jessie but admitted attacking her friend. The responding police officer testified that he had interviewed Jessie and noticed that her right eye was red and swollen and that she had a small cut on her hand.[2]

Jessie testified to other incidents of domestic violence, including one in which Tyler threw scalding water on her and another in which he beat her badly until his brothers intervened. Tyler in turn testified that Jessie had assaulted him the week before the September 2 incident; he said Jessie had thrown things at him, screamed death threats, and hit him repeatedly in the face, all while their children were present in the home.

---

[1]    We use pseudonyms to protect the family's privacy.

[2]    Tyler was later arrested for the offense and pleaded guilty to misdemeanor assault.

An OCS worker testified that she had interviewed Tyler and arranged for his participation in a series of urinalysis (UA) and hair follicle drug tests. While his hair follicle test results had not returned in time for the hearing, they would later reveal a positive for methamphetamine. The court found that probable cause existed that Aaron was a child in need of aid based on domestic violence.

The court held an adjudication hearing in March 2015. OCS worker Mark Loper testified that Tyler had initially engaged with OCS and his children, but that he had since failed to follow through on his referrals for a substance abuse assessment and parenting classes. Loper said that Tyler stopped contacting OCS and stopped visiting his children in January 2015. Loper testified that Tyler had not complied with any aspect of his case plan as of the adjudication hearing.

Loper had left his position at OCS shortly before the hearing and testified that he had notified Tyler of his departure and told him that his case would be transferred. Loper's supervisor handled Aaron's case after Loper left; she testified that she had changed Loper's voice-mail to redirect callers to her number, but that Tyler had not contacted her. The court found that Aaron was a child in need of aid under subsections (8) (mental injury from domestic violence) and (10) (drug abuse) of AS 47.10.011.

OCS filed a petition to terminate Tyler's parental rights to Aaron in October 2015, and the court held a termination trial in March 2016.[3] The court heard from Ayanna Campbell, who succeeded Loper as Aaron's case worker. Upon taking the case in March, she attempted to contact Tyler through all known addresses and phone numbers, but could not reach him until a fortuitous meeting at the courthouse in the summer of 2015. Tyler told her that he had lost touch because things had "gotten hectic"

---

[3] The trial also involved Jessie's parental rights to Aaron and his half-brother.

and he was working through some issues. Campbell testified that even after this meeting, Tyler did not participate in another substance abuse assessment that Campbell recommended for him; he did not attend the drug tests that he and Campbell had agreed to; and although OCS re-initiated visitation between him and Aaron, Tyler attended only one or two visits in November 2015 before moving to Florida.

Tyler testified by phone from Florida. He blamed his inconsistent contact with OCS and his children on OCS's negligence; he claimed, despite Loper's earlier testimony, that he had no notice of Loper's departure from OCS or that his case had been transferred; that he had left numerous voice mails without anyone at OCS responding; that he had stopped attending visitation in November because he "would show up and [OCS] would . . . never bring the kids down"; that he was participating in a parenting class in Florida; and that he had moved to Florida because he felt his family there offered a better support network for his children and because he felt OCS's Florida counterpart would treat his case more fairly than Alaska's OCS had.

Campbell testified that she had always attempted to return Tyler's messages and that she was aware of only one instance when Tyler had shown up for a visit but the children were not there because of miscommunication between OCS workers. She said that she had sent Tyler a release of information form for the parenting course that he claimed to be taking, but that neither Tyler nor the organization offering the course had returned the form. She acknowledged that OCS had not referred Tyler to a new substance abuse assessment or UA appointments since he moved to Florida.

The court found that Tyler had exposed Aaron to conduct or conditions described in AS 47.10.011 subsections (8) (mental injury) and (10) (substance abuse), stating that Tyler and Jessie had "exposed the children to multiple instances of domestic violence, placing them at substantial risk of mental injury." The court described Tyler's testimony as "quite incredible at times" and found him not to be a credible witness. It

found that he had failed to comply with his case plan or remedy the conditions that made Aaron a child in need of aid. The court expressed disappointment that OCS did not refer Tyler to a substance abuse assessment or UA appointments in Florida, but found this failure excusable in light of Tyler's failure to engage with his case plan. The court finally found that termination of parental rights was in Aaron's best interests, given Aaron's young age and need for permanency.

In light of these findings, the court terminated Tyler's parental rights to Aaron.[4] Tyler now appeals.

## III. STANDARD OF REVIEW

Whether a child is in need of aid under AS 47.10.011, whether the parent has remedied the conditions that put the child in need of aid, and whether termination of parental rights is in the best interests of the child are all questions of fact which we review for clear error.[5] "We will find clear error only when a review of the entire record leaves us 'with a definite and firm conviction that the superior court has made a mistake.' "[6] Conflicting evidence is generally "insufficient to overturn the superior court's decision, and we will not reweigh evidence when the record provides clear support for the superior court's ruling."[7] We will likewise defer "to the superior court's

---

[4] The court also terminated Jessie's parental rights to Aaron and his half-brother.

[5] *Sherman B. v. Dep't of Health & Soc. Servs.*, 310 P.3d 943, 948-49 (Alaska 2013) (citations omitted).

[6] *David S. v. State, Dep't of Health & Soc. Servs.*, 270 P.3d 767, 774 (Alaska 2012) (quoting *S.H. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 42 P.3d 1119, 1122 (Alaska 2002)).

[7] *Id.* (quoting *Hannah B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 289 P.3d 924, 930 (Alaska 2012)).

credibility assessments, especially when such assessments are based on oral testimony."[8] "Whether OCS has made reasonable reunification efforts is a mixed question of law and fact."[9]

## IV.   DISCUSSION

A court may terminate the rights and responsibilities of a parent to a child if the court finds by clear and convincing evidence:  (1) the child is in need of aid under AS 47.10.011; (2) the parent has not remedied the conduct or conditions in the home that placed the child at substantial risk of injury; and (3) OCS has made timely, reasonable efforts to provide family support services to the parent and child in order to facilitate reunification.[10] The court must also find "by a preponderance of the evidence that termination of parental rights is in the best interests of the child."[11]  The trial court in this case made findings under each element of the statute, and Tyler challenges each finding on appeal.

### A.   The Trial Court Did Not Clearly Err In Finding That Tyler Had Exposed Aaron To Domestic Violence As Defined In AS 47.10.011(8).

Tyler challenges the trial court's finding that Aaron was a child in need of aid under AS 47.10.011(8).  Subsection (8) describes parental conduct that has either "resulted in mental injury to the child" or "placed the child at substantial risk of mental

---

[8]     *Id.* (citing *Hannah B.*, 289 P.3d at 930).

[9]     *Id.* (citing *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 428 (Alaska 2012)).

[10]     *See* AS 47.10.088(a)(1)-(3); *see also* AS 47.10.086(a).

[11]     CINA Rule 18(c)(3); *see also* AS 47.10.088(c).

injury."[12]  Risk of mental injury may arise from exposure to domestic violence, which the statute defines as "conduct by a household member . . . against another household member" that would constitute certain offenses against the person.[13]

The trial court's AS 47.10.011(8) finding was not clearly erroneous. Jessie testified that Tyler beat her on September 2, 2014, as Aaron called out, "[T]hat's my mom, Dad, that's my mom." Tyler also testified to another incident where Jessie attacked him while Aaron was present in the home. We have held that "witnessing domestic violence is mentally harmful to children."[14]

Tyler responds that subsection (8) requires "expos[ure] to multiple instances of domestic violence," and that Aaron in any event was never "exposed" to such conduct during the September 2014 incident because he was in another room when Tyler's quarrel with Jessie occurred. We find these arguments unpersuasive. First, the trial court properly found that Jessie and Tyler had "exposed the children to multiple incidents of domestic violence," based on Jessie's testimony regarding the September 2014 incident and Tyler's testimony about an incident the week before where Jessie attacked him, screaming death threats, while Aaron was in the home. Nor does the language of AS 47.10.011(8) require visual exposure to domestic violence, as opposed to some other form of contemporaneous awareness that domestic violence is happening.[15]

---

[12]     AS 47.10.011(8)(A)-(B).

[13]     AS 47.10.011(8)(B)(ii).

[14]     *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 79 P.3d 50, 55 (Alaska 2003).

[15]     *See* Lois A. Welthorn, *Protecting Children from Exposure to Domestic Violence: The Use and Abuse of Child Maltreatment*, 53 Hastings L. J. 1, 81-82 (2001) ("The term 'exposure' to domestic violence attempts to capture the full range of
(continued...)

The exposure recounted in the parents' testimony satisfies subsection (8), and it was not clear error for the trial court to find that Aaron was a child in need of aid under AS 47.10.011(8).[16]

**B.    The Trial Court Did Not Clearly Err In Finding That Tyler Had Failed To Remedy These Conditions In A Reasonable Amount Of Time.**

Tyler also challenges the trial court's finding under AS 47.10.088(a)(2)(B) that he failed to remedy the conduct and conditions that placed Aaron at substantial risk of harm.  We hold that this finding was not clearly erroneous.

"A failure to comply with a case plan may constitute a failure to remedy."[17] By the time of the termination trial Aaron had been in OCS custody for about 18 months, and the trial court had ample basis to find that Tyler had not complied with his case plan.

---

[15]    (...continued) experiences that confront children living in these families.  Initially, authors writing about children exposed to domestic violence spoke about children who witness domestic violence, emphasizing children's contemporaneous visual, and perhaps also auditory, observation of violent acts between their parents or between one parent and that parent's intimate partner.  Those state statutes that explicitly criminalize children's exposure to domestic violence typically refer to the offense as 'domestic violence in the presence of a child,' and may incorporate any type of contemporaneous experience of the violence, even if the children are not in the room where the violence occurs.") (citations omitted).

[16]    Tyler also challenges the trial court's finding under AS 47.10.011(10) that his ability to parent had been substantially impaired by the addictive or habitual use of an intoxicant, and the addictive or habitual use of the intoxicant had resulted in a substantial risk of harm to the child.  Because we affirm the trial court's finding under AS 47.10.011(8), we need not consider the trial court's findings under other subsections of AS 47.10.011.  *See Casey K. v. State, Dep't of Health & Soc. Servs.*, 311 P.3d 637, 644 (Alaska 2013).

[17]    *Sherman B. v. State, Dep't of Health & Soc. Servs.*, 310 P.3d 943, 952 (Alaska 2013) (citing *Maisy W. v. State ex rel. Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1268 (Alaska 2008)).

The court expressly relied on Tyler's failure to abide by the recommendations of his substance abuse assessor, his consistent failure to appear for his drug-test appointments since November 2014, and his failure to return the information release for his enrollment in a parenting class in Florida, which prevented OCS from verifying his attendance. The record also contains evidence that Tyler failed to engage in any OCS-referred parenting classes — which were intended to help Tyler understand how his violence affected Aaron — until he moved to Florida, more than a year after they were recommended to him. This was part of a larger pattern of Tyler missing OCS appointments, dropping out of contact with OCS and his children for months at a time, and moving to the opposite end of the country.

Tyler now asks this court to adopt his version of the facts in which he denies all fault for this course of events. But the trial court found his excuses "incredible," based on the contrary testimony of OCS's witnesses. Given the evidence described above, the trial court did not clearly err in finding that Tyler had failed to remedy the conduct placing Aaron at risk of harm.

## C. The Trial Court Did Not Err In Finding That OCS Had Made Reasonable Efforts.

Tyler also challenges the trial court's finding that OCS made reasonable efforts at reunification. We affirm the trial court's finding.

Under AS 47.10.086(a), OCS's "reasonable efforts" must include locating support services to assist the parent, referring the parent to those services where available, and documenting its efforts. The trial court must review OCS's efforts as a whole, over the entire history of the case, rather than in a particular segment of time.[18]

---

[18] *See Barbara P. v. State, Dep't of Health & Soc. Servs.*, 234 P.3d 1245, 1262 (Alaska 2010); *Maisy W.*, 175 P.3d at 1268.

"Reunification efforts need not be perfect, only reasonable in light of the circumstances," which can include "a parent's unwillingness to participate in treatment."[19]

The record shows that OCS attempted to facilitate reunification between Tyler and Aaron, but that Tyler was unwilling to participate. OCS at the outset referred him to a substance abuse assessment, UA appointments, parenting classes, and visitation — opportunities with which Tyler consistently failed to engage. Tyler soon dropped out of contact with Loper and Campbell, and when Campbell re-established contact and attempted to revive Tyler's lapsed case plan, he again failed to participate. After OCS filed its petition for termination, Tyler moved to Florida. Campbell then referred him to a parenting class in Orlando, but Tyler never verified his attendance.

OCS did make occasional missteps: One visitation appointment was canceled due to miscommunication, and Campbell did not refer Tyler for a new substance abuse assessment after he moved to Florida. But these instances do not amount to a lack of reasonable efforts when considered within the context of OCS's efforts to engage with Tyler over an 18-month period.[20] The trial court's finding that OCS made reasonable efforts to reunify Tyler and Aaron was not erroneous.

**D.     The Trial Court Did Not Clearly Err In Finding That Termination of Tyler's Parental Rights Was In Aaron's Best Interests.**

Tyler finally argues that the trial court clearly erred in finding that termination of his parental rights to Aaron was in Aaron's best interests under AS 47.10.088(c). We hold that this finding was not clearly erroneous.

---

[19]     *Amy M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 320 P.3d 253, 259 (Alaska 2013).

[20]     *See E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 990 (Alaska 2002) (holding that "DFYS's failure to make active efforts from January to July 1999 is insignificant in light of the extensive remedial efforts the state has provided throughout its involvement with [the parent's] children").

In making a best interests determination, a court may consider the best interests factors listed in AS 47.10.088(b), including:

> (1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs;
>
> (2) the amount of effort by the parent to remedy the conduct or the conditions in the home;
>
> (3) the harm caused to the child;
>
> (4) the likelihood the harmful conduct will continue; and
>
> (5) the history of conduct or conditions created by the parent.[21]

The court "need not accord a particular weight to any given factor,"[22] and may consider others not named in the list, including the child's need for permanency.[23]

The trial court based its best interests finding largely on Aaron's young age and need for permanency. The court explained to Tyler, "We have two young children here. And Aaron is the youngest. And we just can't wait for you to . . . get your life together. The court seriously thinks that the permanency of . . . Aaron is important at this point. And that is why I'm terminating rights."

On appeal Tyler argues that his non-compliance with his case plan and his move to Florida were rooted in good intentions and his desire to get his life back

---

**21** AS 47.10.088(b); *see Chloe W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 336 P.3d 1258, 1271 (Alaska 2014) (considering the factors listed in AS 47.10.088(b) in the context of a best interests determination under AS 47.10.088(c)).

**22** *Chloe W.*, 336 P.3d at 1271 (citing *Hannah B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 289 P.3d 924, 932 (Alaska 2012)).

**23** *Id.* (citing *Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 968 (Alaska 2013)).

together.  The trial court found that this explanation for the move to Florida was "bunk," but even assuming that Tyler's explanations were credible, his argument does not address the court's legitimate concern:  whatever salutary motives might have prompted Tyler's move south, Aaron had an interest in permanency that militated against waiting — perhaps another 18 months — for Tyler to make progress on his case plan.[24] Tyler concedes that the trial court could "consider the child's need for permanency as a crucial need for the child."  The court's best interests determination thus amounted to a finding that "the likelihood of returning the child to a parent within a reasonable time based on the child's age or needs" weighed decisively in favor of termination.[25]  We conclude that this finding was not clearly erroneous.

## V.     CONCLUSION

We therefore AFFIRM the trial court's judgment terminating Tyler's parental rights.

---

[24]     *See id.* (acknowledging importance of child's need for permanency).

[25]     AS 47.10.088(b)(1).